IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORMAN HUNSINGER, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No.  14-2302 |
| BRIAN P. CARR, | : | |
| Defendant. | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**ROBERT F. KELLY, SR. J.**                                                            **MAY 24, 2016**

Presently pending before the Court is the Complaint to Confirm FINRA Arbitration Award filed by Plaintiff, Norman Hunsinger ("Hunsinger"), against Defendant, Brian P. Carr ("Carr").[1] On April 29, 2016, we conducted an evidentiary hearing where arguments and testimony were presented by both parties regarding the specific issue of whether the FINRA Arbitration Panel had jurisdiction over their dispute.  Arguing that he did not enter into an arbitration agreement with Hunsinger, Carr asserts that Hunsinger was not a "customer" as defined by FINRA, which requires that the instant dispute be arbitrated under FINRA's rules. Therefore, Carr asserts that the FINRA Arbitration Panel lacked jurisdiction over the parties' dispute.  Based upon the testimony during the evidentiary hearing, as well as consideration of all of the parties' filings and all of the proceedings conducted in this action, we find that the FINRA

---

[1]The Financial Industry Regulatory Authority ("FINRA") is "a national association of securities broker-dealers registered with the Securities and Exchange Commission ('SEC') under § 15A of the Exchange Act, 15 U.S.C. § 78*o*–3." Dougherty v. VFG, LLC, 118 F. Supp. 3d 699, 709 n.5 (E.D. Pa. 2015).  "In 2007, [the National Association of Securities Dealers ('NASD')] changed its name to [FINRA]." Id. (citation omitted).  "FINRA is a self-regulatory organization and has the authority to, *inter alia,* create and enforce rules for its members in order to provide regulatory oversight of all securities firms that do business with the public." Id.  (citation omitted). "FINRA membership constitutes an agreement to adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein." Id. (citation omitted).

Arbitration Panel did have jurisdiction. Since Hunsinger moved to confirm the FINRA Arbitration Award, and it has been neither vacated, modified, nor corrected, we will confirm the Award.

## FINDINGS OF FACT

These findings of fact specifically regard the evidentiary hearing held on April 29, 2016, including relevant facts taken from other court documents and proceedings conducted in this action that are pertinent to the issues at hand.

1. Carr was registered with FINRA's predecessor, NASD, in January 1995 through June 2003 regarding his employment as a broker with NASD member WS Griffith Securities, Inc. (Def.'s Ex. A (FINRA's BrokerCheck Report)). From June 2003 until March 6, 2008, Carr was registered with NASD/FINRA as a broker regarding his employment with NASD/FINRA member New England Securities ("NES"). N.T. 4/29/2016, p. 43, lines 22-25; p. 44, lines 1-16; Def.'s Ex. A.

2. Being registered with FINRA, as Carr admits, subjects him to FINRA regulations, including FINRA arbitration. N.T. 4/29/2016, p. 40, lines 10-25; p. 41, lines 1-6 (admitting that he was employed by NES as an "associated person" subject to FINRA regulations and arbitration with FINRA).

3. In June 2003, in conjunction with his employment with NES, Carr signed the Uniform Application for Securities Industry Registration or Transfer ("Form U-4"), which includes an arbitration clause.[2] N.T. 10/26/2015, p. 42-46. By Carr's own admission, "he was subjected to [FINRA's] jurisdiction and [to] arbitrate any dispute, claim or controversy that may arise between him and a customer." (Def.'s Proposed Findings of Fact and Conclusions of Law § 10; p. 9 ("Carr again agreed to arbitrate any disputes

---

[2]In order to sell securities, Carr was obligated to register with a self-regulating organization ("SRO"), approved by the SEC. Dougherty, 118 F. Supp. 3d at 709 n.4. "Registration with the SRO entails, *inter alia,* completing a Form U–4. The form is titled 'Uniform Application for Securities Industry Registration or Transfer.'" Id. (citation and internal quotation marks omitted). The Form U-4, under the section entitled "Individual/Applicant's Acknowledgement and Consent," provides an arbitration clause, which specifically states:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(Def.'s Ex. E, §15A(5)). Carr only provides a blank Form U-4 for our consideration because he was unable to obtain the one he signed. N.T. 10/26/2015, p. 42-43. However, he admits to signing a Form U-4 regarding his employment with NES and concedes that he is bound by it, including its arbitration clause. N.T. 10/26/2015, p. 42-46.

between him and clients of New England Securities."); p. 10 ("Carr could only be bound to arbitrate the Hunsinger claim based upon paragraph 5 of the Form U-4s he signed.")).

4. Hunsinger first became acquainted with NES and Carr in 2004. N.T. 4/29/2016, p. 5, lines 7-9; p. 20, lines 22-25; p. 40, lines 10-24; p. 49, lines 22-23; p. 50-51. Hunsinger testified that he became a client of NES in 2004, and Carr was his registered representative with NES. Id., p. 5, lines 7-25; p. 20, lines 22-25.

5. In 2004, Hunsinger moved his 401k Plan money from his employer, Subaru America, to an account with NES at the suggestion of Carr. N.T. 4/29/2016, p. 5, lines 20-25; N.T. 10/26/2015, p. 6, lines 7-9.

6. In 2006, Hunsinger met with Carr. N.T. 4/29/2016, p. 6, lines 1-6. At the recommendation of Carr, Hunsinger invested in a Carr Miller Capital Note. Id., lines 1-15. Carr advised Hunsinger that the investment was a safe investment. Id. Carr recommended that Hunsinger borrow approximately $280,000 from his home, which he recently received free and clear title to due to the death of his mother. Id., p. 6-8, Hunsinger used the mortgage proceeds to purchase the first Carr Miller Capital Note. Id., p. 9, lines 6-8. Carr provided assistance to Hunsinger in order to obtain the mortgage. Id., p. 8-9.

7. Carr Miller Capital Notes were through Carr Miller Capital and did not have anything to do with NES. N.T. 4/29/2016, p. 24-34. Hunsinger's account representative at Carr Miller Capital was Everett C. Miller. Id. p. 33.

8. In February 2008, Carr recommended that Hunsinger purchase a second Carr Miller Capital Note. N.T. 10/26/2015, p. 7, lines 16-18; N.T. 4/29/2016, p. 9, lines 14-17. At that time, Hunsinger purchased another approximately $200,000 Carr Miller Capital Note resulting in a total investment of $480,000 in Carr Miller Capital. N.T. 10/26/2015, p. 7, lines 16-21.

9. Hunsinger testified that he would not have purchased either of the two Carr Miller Capital Notes if Carr had not recommended them. N.T. 4/29/2016, p. 9, lines 18-20.

10. Carr states that he never received any fees or commissions from Carr Miller regarding the two Carr Miller Notes purchased by Hunsinger. N.T. 4/29/2016, p. 52, lines 5-12.

11. On February 6, 2008, Carr sent a letter to NES formally resigning as a "registered representative" and "career agent" of NES effective at the end of the business day. N.T. 4/29/2016, p. 42, lines 2-12; Def.'s Ex. B. Carr's letter stated that "[a]t this time[,] it is my intent to continue a professional working relationship as a broker of traditional products with New England Financial, so that[,] most importantly[,] clients and all involved interests are served well." (Def.'s Ex. B.) In conjunction with the resignation,

as required by FINRA, NES filed a Form U-5 (Uniform Termination for Securities Industry Resignation) with FINRA.[3]  N.T. 4/29/2016, p. 44, lines 2-16; Def.'s Ex. C.

12. Carr specifically testified that March 6, 2008, was the date that NES and FINRA designated as the date of his official resignation.  N.T. 4/29/2016, p. 43, lines 22-25, p. 44, line 1; p. 45, lines 12-13; Def.'s Ex. C.

13. There is a letter from NES dated April 15, 2008, stating that Carr is no longer affiliated with it.  (Def.'s Ex. D.)

14. During the relevant time period of 2006 and 2008, when Hunsinger purchased the two Carr Miller Capital Notes, Carr was registered with FINRA and was employed by NES acting as its "registered representative" or "associated person" regarding the investment and securities services that he provided to Hunsinger.  N.T. 4/29/2016, p. 5, lines 20-25; p. 20, lines 22-24; p. 40, lines 10-24; p. 41, lines 1-6; p. 43, lines 22-25; p. 44, lines 1-16; Pl.'s Ex. 9 (FINRA BrokerCheck Report).

15. Carr was chairman of Carr Miller Capital from 2008 to 2009.  N.T. 4/29/2016, p. 55, lines 15-18.

16. Hunsinger received interest on the two Carr Miller Notes until the Spring of 2010 when it was discovered that they were worthless as part of a Ponzi scheme orchestrated by Everett C. Miller.  N.T. 10/26/2015, p. 7; N.T. 4/29/2016, p. 9-10.

17. The Ponzi scheme was large and involved multiple states and approximately 40 million dollars.  Tr. 10/26/15, p. 8, lines 10-14.  Everett C. Miller was sentenced in July 2015 to a ten-year term of imprisonment.  Tr. 10/26/15, p. 8, lines 10-16.

18. Hunsinger brought the arbitration claim against NES and Carr in 2011 (Case No. 11-03427).  (See Compl., Ex. A (Arbitration Award)).  He filed an Amended Statement of Claim on September 27, 2011.  (Id.)  He withdrew his claims against NES on April 22, 2013.  (Id.)

19. By a letter dated February 21, 2102, Carr filed an Answer to the Statement of Claim arguing, *inter alia*, that the FINRA arbitration panel did not have jurisdiction over him.  (Pl.'s Ex. P-2.)  Although Carr filed an Answer, he did not sign or submit a Submission Agreement.  (See Compl., Ex. A.)

20. Throughout the FINRA arbitration process, Carr continually argued that FINRA did not have jurisdiction over him.  Pl.'s Exs. P-2, P-3; Def.'s Exs. I-1, K, L, P.

---

[3] "The Form U-5 is the standard form used in the securities industry to report the termination of a registered representative's association with a broker-dealer."  Adams v. Wells Fargo Advisors, LLC., No. 12-2130, 2014 WL 2124447, at *7 n.7 (D. Md. May 21, 2014) (citation and internal quotation marks omitted).

4

21. On September 10, 2013, a three-member FINRA Arbitration Panel sitting in Philadelphia, PA, held an arbitration hearing. (Pl.'s Ex. P-13.) Carr did not appear at the hearing. (See Compl., Ex. A.)

22. On September 30, 2013, the FINRA Arbitrators unanimously issued an Award in favor of Hunsinger against Carr in the amount of $294,945, which includes some settlement costs related to the mortgage that he acquired and a small award for attorneys fees. Tr. 10/26/15, p. 8, lines 19-25; Compl., ¶ 11, Ex. A. The $480,000 investment resulted in a net loss to Hunsinger of $284,500, which is the primary basis of the FINRA Award, because he was receiving substantial interest payments over a period of years. Tr. 10/26/15, p. 9, lines 2-12.

23. The FINRA Arbitration Award specifically stated that:

> Upon review of the file and the representations made on behalf of the Claimant, the undersigned arbitrators (the 'Panel') determined that Respondent Carr has been properly served with the Statement of Claim and received due notice of the hearing, and that arbitration of the matter would proceed without said Respondent present, in accordance with the Code of Arbitration Procedure (the 'Code').
>
> Respondent Carr did not file with FINRA Dispute Resolution a properly executed Submission Agreement but is required to submit to arbitration pursuant to the Code and, having answered the claim, is bound by the determination of the Panel on all issues submitted.

(Compl., Ex. A. at 2.)

24. After the Arbitration Award, Hunsinger did not receive any payments from Carr. (Compl. ¶ 12.)

25. Even though Carr was no longer registered with FINRA as of March 6, 2008, FINRA suspended Carr on February 25, 2014, due to his failure to pay Hunsinger's arbitration award.[4] (Compl. ¶ 12; Pl.'s Ex. P-9.)

26. Hunsinger filed a Motion to Confirm FINRA Arbitration Award with this Court on April 21, 2014, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. (Doc. No. 1.) Carr argues that the FINRA Arbitration Panel did not have jurisdiction over him. (See N.T. 4/29/2016.)

27. While other hearings have been conducted in this case, the Court held a hearing on April 29, 2016, specifically regarding the issue of FINRA's jurisdiction over the dispute

---

[4]"FINRA Rule 9554 provides that if a member or associated person fails to comply with an arbitration award, FINRA will cancel or suspend the member or associated person's membership in or registration with FINRA, effectively terminating the broker/dealer's ability to continue operations." Waveland Capital Partners, LLC v. Tommerup, 928 F. Supp. 2d 1227, 1234 n.6 (D. Mont. 2013)

5

between Hunsinger and Carr.  (Doc.  No. 41; see N.T. 4/29/2016.)  Both Hunsinger and Carr testified at the hearing.  (See N.T. 4/29/2016.)

## CONCLUSIONS OF LAW

1. The FAA provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

2. "The [FAA] itself, 9 U.S.C. § 1 *et seq.,* does not create federal question jurisdiction." Pfizer Inc. v. Uprichard, 422 F.3d 124, 128 n.5 (3d Cir. 2005) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32)).  An independent basis of jurisdiction is needed. Id.  "[F]ederal courts have jurisdiction to adjudicate suits under the FAA pursuant to 28 U.S.C. § 1332." Id. (citation omitted).

3. Here, pursuant to 28 U.S.C. § 1332, we have diversity jurisdiction over the subject matter of this suit and the arbitration took place in Philadelphia.[5]  See 28 U.S.C. § 1332; 9 U.S.C. § 9 (stating that "application [to confirm award] may be made to the United States court in and for the district within which such award was made").  The FAA applies to arbitrations involving interstate commerce, such as the securities at issue here.  See 9 U.S.C. § 1; see also Pl.'s Exs. 15-17.  Therefore, "the FAA and 'federal law, including general principles of contract law' will apply 'regarding the construction and enforcement of [the] arbitration clause.'" Dougherty, 118

---

[5] Diversity jurisdiction pursuant to 28 U.S.C. § 1332 exists because, at the time that the Complaint was filed, Hunsinger was a citizen of Pennsylvania and Carr was a citizen of New Jersey, and the amount in controversy exceeded $75,000.  (See Compl.)

F. Supp. 3d at 711 (quoting Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 54 (3d Cir. 2001)).

4.  "Generally, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Dougherty, 118 F. Supp. 3d at 711 (quoting AT & T Tech. v. Commc'n Workers of Am., 475 U.S. 643, 648 (1986)). "'The identification of the parties bound by the agreement to arbitrate need not be confined to the limited inquiry of identifying the signatories to the arbitration agreement. Rather, the dispositive finding is an express and unequivocal agreement between parties to arbitrate their disputes.'" Id. at 711-12 (quoting In re Prudential Ins. Co. of Am. Sales Practice Litig., 133 F.3d 225, 229 (3d Cir. 1998)). The United States Court of Appeals for the Third Circuit ("Third Circuit") "has recognized that 'a variety of nonsignatories of arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles.'" Id. (quoting In re Prudential Ins. Co., 133 F.3d at 229.) "And 'courts have been willing to apply third party beneficiary law in examining the contractual standing of a non-signatory party to a dispute, provided there is an expression of the requisite intent between the third party and the plaintiff to arbitrate their claims.'" Id. (quoting In re Prudential Ins. Co., 133 F.3d at 229).

5.  The strong federal policy favoring arbitration, including the general presumption in favor of enforcing arbitration clauses, does not apply in cases, such as the instant case, which involves a dispute about the existence of an agreement to arbitrate involving a non-signatory to an arbitration agreement. See Dougherty, 118 F. Supp. 3d at 712 (citing Griswold v. Coventry First LLC, 762 F.3d 264, 271 (3d Cir. 2014); Citigroup Global Mkts., Inc. v. Abbar, 761 F.3d 268, 274 (2d Cir. 2014); Marciano v. MONY Life Ins. Co., 470 F. Supp. 2d 518, 525–26 (E.D. Pa. 2007)).

6.      "In determining whether a valid agreement to arbitrate exists between the parties, the Third Circuit has instructed district courts to give the party opposing arbitration 'the benefit of all reasonable doubts and inferences that may arise,' or, in other words, to apply the familiar Federal Rule of Civil Procedure 56(c) summary judgment standard."  Marciano, 470 F. Supp. 2d at 525 (quoting Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 & n.9 (3d Cir.1980); citing Berkery v. Cross Country Bank, 256 F. Supp. 2d 359, 364 n.3 (E.D. Pa. 2003)).

7.      It is undisputed that Carr is bound by the arbitration clause in Form U-4.  See *supra* Findings of Fact §§ 1-3.  Thus, according to the arbitration clause in Form U-4, Carr agreed to arbitrate Hunsinger's claim if it is required to be arbitrated under FINRA rules, specifically, Rule 12200 of FINRA's Code of Arbitration Procedure for Customer Disputes ("FINRA Code").  See Def.'s Ex. E (Form U-4); FINRA Code Arb. Proc. 12200.

8.      Rule 12200, entitled "Arbitration Under an Arbitration Agreement or the Rules of FINRA," provides as follows:

> Parties must arbitrate a dispute under the Code if:
>
> • Arbitration under the Code is either:
>
> (1) Required by a written agreement, or
>
> (2) Requested by the customer;
>
> • The dispute is between a customer and a member or associated person of a member; and
>
> • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Code Arb. Proc. 12200; see also Dougherty, 118 F. Supp. 3d at 713 ("The Form U–4 and FINRA Rule 12200 requires an 'associated person' to submit to arbitration at the request of a 'customer.'").

8

9.      If the instant dispute between Hunsinger and Carr, falls within the purview of Rule 12200, then it is subject to arbitration. Since there is no written arbitration agreement between the parties requiring arbitration, Hunsinger can only satisfy the first prong if he is a "customer." See Rule 12200. Rule 12100 defines "customer" by clarifying that "[a] customer shall not include a broker or dealer." Rule 12100 - Definitions, Code of Arbitration Procedure for Customer Disputes. Carr denies any obligation to arbitrate under Rule 12200 arguing that Hunsinger is not a "customer" as defined in the FINRA Rules.

10.     Although "[b]oth the Form U-4 and the Rule 12200 use the term 'customer,'" neither "offers a thorough definition of the term."[6] Dougherty, 118 F. Supp. 3d at 713. "Rule 12200 simply provides 'that a customer shall not include a broker or dealer.'" Id. (quoting Abbar, 761 F.3d at 274). "'[T]he word 'customer' must be construed in a manner consistent with the reasonable expectations of FINRA members.'" Id. (quoting Abbar, 761 F.3d at 274). "[A]n individual who opens an account with a FINRA member 'has a reasonable expectation to be treated as a customer, whether or not goods or services are purchased directly from the FINRA member.'" Id. (quoting Abbar, 761 F.3d at 275). Pursuant to Rule 12200, a "customer" is "'one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member.'" Id. (quoting Abbar, 761 F.3d at 275); see also Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 741 (9th Cir. 2014) (stating that a "'customer' is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities"); UBS Fin. Servs., Inc. v.

---

[6] Although the Form U-4 does not expressly define the term "customer," both it and Rule 12200 use the term in the same context. Dougherty, 118 F. Supp. 3d at 713 n.8. "Because the Form U-4 represents an agreement to be bound by the FINRA Rules, the definition of the term 'customer' used in FINRA Rule 12200 should be equally applied to the Form U-4." Id.

Carilion Clinic, 706 F.3d 319, 325 (4th Cir. 2013) (defining "customer" as "one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business.").

11.     Hunsinger, who is neither a broker nor a dealer, is a "customer" within the meaning of Rule 12200.[7]  It is undisputed that Hunsinger held an account with FINRA member NES.  See *supra* Findings of Fact ¶¶ 4, 5.  Likewise, in 2004, it is undisputed that he entered into a direct investment relationship with NES, as well as Carr who directly provided services to Hunsinger during the pertinent time period in his role as a NES's broker or "associated person" while registered with FINRA.  Id.    ¶¶ 1-6, 8, 9, 14.

12.     Since Hunsinger had a direct investment relationship with NES and Carr, and the dispute concerns representations made by Carr in the course of his role as NES's broker or "associated person" regarding the recommendation of investments in particular securities, Rule 12200's requirement that "the dispute arises in connection with the business activities of the member or the associated person" is met.[8]  See Dougherty, 118 F. Supp. 3d at 713 n.9; Gilmore v. Brandt, No. 11-151, 2011 WL 5240421, at *5 (D. Colo. Oct. 31, 2011) ("There can be no question but that claims as Gilmore brought here related to the recommendation of an investment in particular

---

[7] The status of "customer" is required to be "'determined as of the time of the events providing the basis for the allegations of fraud.'"  O.N. Equity Sales Co. v. Emmertz, 526 F. Supp. 2d 523, 530 (E.D. Pa. 2007) (quoting Wheat, First Secs., Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993)).

[8] Regarding the issue of whether "the dispute arises in connection with the business activities of the member or the associated person," Carr's attorney referred to Multi-Financial Sec., Corp. v. Brown, No. 02-3828, 2002 WL 32130291, at *2 (E.D. Pa. Dec. 20, 2002) (finding that seven documents linked to the Browns clearly established that the offshore trust account in question was established and maintained by them; therefore, Defendants' claims clearly arose in connection with the activities of the Browns). N.T. 4/29/2016, p. 68-69.  We have read this case and find that it neither changes our reasoning nor our conclusion in this case.

securities, fall within the class of disputes wherein the issues are reasonably related to FINRA regulated activities.") (citation and internal quotation marks omitted ).

13.     Carr argues that Hunsinger does not qualify as a "customer" based upon the fact that Hunsinger's investments with Carr Miller Capital were separate from NES since they involved Everett C. Miller and Carr Miller Capital, and Carr did not receive any commission.  N.T. 4/29/2016, p. 68-69.  We note that "courts, in other districts have compelled brokerage firms to arbitrate a customer claim based on a firm employee's rogue activities, provided those activities were regarding trading activity."  Peyser v. Kirshbaum, No. 12-2857, 2012 WL 6200739, at *3 (S.D. N.Y. Dec. 11, 2012) (citing e.g., Lincoln Fin. Advisors Cor., v. Healthright Partners, LP, No. 09-650, 2010 WL 322141 (D. Utah Dec. 25, 2010)); see also Gilmore v. Brandt , 2011 WL 5240421, at *4 ("Brandt's attempt to cabin his liability by arguing that Gilmore was never his customer, but was, instead, a customer of DLG, or that he never received any commission from Gilmore's investment, is unsupportable under both the spirit and letter of [Rule 12200].").

14.     As a "customer" of NES and Carr, Hunsinger is an intended third-party beneficiary of the Form U-4 and Rule 12200.  See Dougherty, 118 F. Supp. 3d at 714 ("As customers to Cetera and Oates, there is no doubt that Plaintiffs are intended third-party beneficiaries of both the Form U-4 and the FINRA rules.") (citing Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts P'ship, 41 F.3d 861, 863-64 (2d Cir. 1994); Scobee Combs Funeral Home, Inc. v. E.F. Hutton & Co., Inc., 711 F. Supp. 605, 607 (S.D. Fla. 1989); Gilmore, 2011 WL 5240421, at *3 n.4); see also Goldman, 747 F.3d at 739 ("FINRA Rule 12200 constitutes an 'agreement in writing' under the FAA, and, assuming [Defendant] is a customer, it is entitled to invoke FINRA Rule 12200 as an intended third-party beneficiary in its dispute with [Plaintiff]."); J.P. Morgan Sec. Inc. v. Louisiana Citizens Prop. Ins. Corp., 712 F. Supp. 2d 70, 76-77 n.41 (S.D.N.Y. 2010) ("[FINRA Rule

12200] creates 'a compulsory arbitration agreement' between FINRA and its members, of which customers are intended 'third party beneficiaries.'") (citing cases).

15. Based upon the forgoing, we find that Hunsinger was a "customer" under Rule 12200, and that his claim arose in connection with FINRA regulated business activities of Carr and NES. Thus, pursuant to the FINRA Arbitration Code, there is a valid agreement to arbitrate between Hunsinger and Carr, and the dispute at issue here is within the scope of that agreement. Accordingly, FINRA did have jurisdiction over Carr.[9]

16. On December 14, 2015, we ordered that this lawsuit be held in abeyance pending the resolution of the jurisdictional issue. (Doc. No. 40.) Finding that FINRA did have jurisdiction, we will now turn to Hunsinger's Complaint to Confirm FINRA Arbitration Award.[10] (Doc. No. 1.) "The FAA provides that 'unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10-11],' the Court 'must grant' a motion to confirm the award." Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc., No. 13-2930, 2016 WL 1642414, at *9 (E.D. Pa. Apr. 26, 2016) (quoting Kulchinsky v. Ameriprise Fin., No. 11-319, 2011 WL

---

[9] As an additional argument, Carr also asserts that he was no longer under FINRA's jurisdiction because Hunsinger's claim was filed more than two years after Carr's registration with FINRA was terminated. N.T. 4/29/2016, p. 69-71; Def.'s Ex. F (FINRA Article V – Sec. 4 – Retention of Jurisdiction). We do not consider this argument as the United States Supreme Court has made clear that questions of procedural arbitrability are reserved to the arbitration panel. See Howsam v. Dean Witter Reynolds, 537 U.S. 79, 85 (2002) (finding, under nearly identical circumstances, that "the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what our cases have called 'questions of arbitrability.'"); Puleo v. Chase Bank US, N.A., 605 F.3d 172, 178-79 (3d Cir. 2010).

[10] Section 9 of the FAA provides, in pertinent part:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9.

2745967, at *14 (E.D. Pa. July 14, 2011) (quoting 9 U.S.C. § 9)).  Even though this lawsuit was filed more than two years ago, Carr has never moved to vacate nor sought equitable tolling of the FAA's three-month limitation period in 9 U.S.C. § 12.  <u>See</u> 9 U.S.C. § 12 (stating that a motion to vacate, modify, or correct an arbitration award must be filed within three months of the award being filed or delivered).  There is no basis upon which to vacate, modify, or correct the FINRA Arbitration Award; therefore, we grant Hunsinger's Complaint to Confirm FINRA Arbitration Award.

      An appropriate Order follows.